OPINION OF THE COURT
GREENBERG, Circuit Judge.
I. INTRODUCTION
This matter comes on before this Court on appeal from a final order of the District Court entered on May 15, 2008, affirming an April 20, 2007 order of the Bankruptcy Court. This case originated in the Bankruptcy Court when William Brandt, the trustee in bankruptcy proceedings of Plassein International Corporation (“Plassein”) and the subsidiaries it had acquired in related leveraged buyouts, brought an adversary proceeding seeking to recover the payments the shareholders of the acquired corporations had received for their shares on the grounds that the payments to them had been fraudulent transfers avoidable under Delaware Law and the Bankruptcy Code. The proceeding was unsuccessful because the Court granted the shareholders’ motions to dismiss, primarily on the basis of our opinion in Lowenschuss v. Resorts Int’l, Inc. (In re Resorts Int’l, Inc.), 181 F.3d 505, 509 (3d Cir.1999) (“Resorts”). The trustee appealed to the District Court but that court affirmed the Bankruptcy Court order and, for the reasons that follow, we will affirm the order of the District Court.
II. BACKGROUND
Plassein was formed in 1999 to acquire several privately-held manufacturing corporations through leveraged buyouts. In a leveraged buyout, the purchaser funds the acquisition using borrowed money with the target company’s assets usually being pledged as security for the loan after the acquisition is completed.
As planned, Plassein acquired several manufacturing corporations through leveraged buyouts in which, in accordance with an agreement with Plassein’s lenders, each newly-acquired corporation pledged its assets as collateral for the loans to Plassein to finance the purchases. Furthermore, each acquired corporation agreed that it would be jointly and severally liable for all the funds that Plassein borrowed for all of *255 the leveraged buyouts. As would be expected, this cross pledging of assets and assumptions of liability resulted in each acquired company having debts far exceeding its assets and thus, according to the trustee, the transactions rendered the acquired corporations insolvent.
Prior to the leveraged buyouts, all of the acquired companies had been privately-held with most having only a few shareholders. After agreeing to the buyouts, the selling shareholders delivered their shares to Plassein, which directed its bank (Fleet Bank) to wire funds to the shareholders’ private accounts at their various banks to pay for the shares delivered. In these purchases the parties did not make use of the “settlement system” — the system of intermediaries and guarantees usually employed in securities transactions.[1]
A few months after the acquisitions, Plassein and the acquired companies began missing payments to the lenders that had provided Plassein with the funds for the buyouts. Eventually, Plassein and the acquired companies filed petitions seeking relief under Chapter 11 of the Bankruptcy Code but subsequently the bankruptcies were converted to Chapter 7 proceedings and Brandt was appointed as trustee for their estates.
As we indicated at the outset of this opinion, in the adversary proceedings the trustee initiated against the selling shareholders of the acquired companies he contended that the buyout payments made to them in exchange for their privately-held stock were fraudulent transfers, avoidable by the trustee under Delaware law and 11 U.S.C. § 544. In their motions to dismiss the adversary proceedings the previous shareholders of the acquired companies argued that the payments could not be recovered because they were “settlement payments” made by or to a financial institution and thus were protected from avoidance by 11 U.S.C. § 546(e).[2] The Bankruptcy Court, relying primarily on our opinion in Resorts, agreed with the shareholders that the payments were exempt “settlement payments” under section 546(e), and thus the Court granted their motions to dismiss.[3] The trustee appealed to the District Court, which affirmed the order of the Bankruptcy Court, and the trustee now appeals from the order of the District Court.
*256 ■ III. JURISDICTION AND STANDARD OF REVIEW
The Bankruptcy Court had jurisdiction over the adversary proceeding under 28 U.S.C. § 157(b), and the District Court had jurisdiction to review the Bankruptcy Court’s final decision under 28 U.S.C. § 158(a). We have jurisdiction to review the District Court’s order under 28 U.S.C. § 158(d)(1). Inasmuch as the District Court was sitting as an appellate court, we essentially are reviewing the Bankruptcy Court’s order of dismissal. See Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 131 (3d Cir.1998). We exercise de novo review over orders granting motions to dismiss. Id.
IV. DISCUSSION
More than 20 years ago we held that leveraged buyouts in corporate acquisitions were subject to fraudulent transfer laws. See United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1297 (3d Cir.1986). This treatment seemed appropriate because leveraged buyouts, in certain circumstances, can prejudice unsecured creditors of the acquired company by exchanging the equity in the acquired company for secured debt held by other creditors with priority over the claims of the unsecured creditors. Id.; see also Oscar N. Pinkas, No Collateral and No Cash: Fraudulent Avoidance in Private Equity-Leveraged Buyouts, Am. Bankr.Inst. J., Oct. 27, 2008, at 18. Accordingly, the use of a debtor’s assets for security for a loan can impair the ability of unsecured creditors to recover them debts from the debtor. Therefore a reasonable argument can be made that, if possible, fraudulent transfer laws should not be applied to protect leveraged buyouts from being avoided as fraudulent transfers.
Nevertheless, we do not write on a blank slate when construing section 546(e) which shields certain settlement payments from a trustee’s power to avoid a transfer as fraudulent. Indeed, in Resorts, as a result of our analysis of section 546(e), we concluded that the challenged transfer could not be avoided as a fraudulent transfer.[4] Other Courts of Appeals have followed our opinion in Resorts. See, e.g., QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.), 571 F.3d 545, 551 (6th Cir.2009); Contemporary Indus. Corp. v. Frost, 564 F.3d 981, 985-86 (8th Cir.2009); see also Lisa G. Beckerman & Robert J. Stark, LBOs and Fraudulent Conveyances: The Third Circuit Does an About Face, 2 Norton Bankr.L. Adviser 1 (2000) (noting our “watershed” ruling).
A. “Settlement Payments” and Our Opinion In Resorts
Resorts dealt with Resorts International, Inc., a publicly-traded corporation that had been purchased in a leveraged buyout. One shareholder, Fred Lowenschuss, initially refused the buyout offer of $36 per share and demanded a judicial appraisal of his shares to establish the price for their purchase. He subsequently changed his mind ' about seeking an appraisal as he later filed a petition in the District Court requesting payment of $36 per share in exchange for the immediate tender of his shares. Lowenschuss delivered his shares to his broker (Merrill Lynch) who tendered the shares to Resorts International’s *257 transfer agent (Chase Manhattan Bank). When Chase Manhattan informed Resorts International of Lowenschuss’s tender, Resorts International’s treasurer directed Chase Manhattan to pay Lowenschuss the $36 per share that Lowenschuss sought. Consequently, Chase Manhattan Bank sent a check to Merrill Lynch for $36 per share and Merrill Lynch, in turn, paid the funds to Lowenschuss.
Resorts International subsequently realized that it had paid Lowenschuss the full merger price instead of the lower price it hoped to win in the appraisal proceeding from the court. Therefore Resorts International initiated a suit to recover the payment, but before the suit was complete Resorts International filed a petition in bankruptcy. In the bankruptcy court, the trustee sought to avoid the payment as a fraudulent transfer.[5] Lowenschuss argued that the payment to him could not be avoided because he had received his funds through a settlement payment and section 546(e), the provision at issue in this case, provides that a trustee may not avoid a transfer made as a “settlement payment” by or to a financial institution.
In Resorts we focused on the final clause of the definition of “settlement payment” in 11 U.S.C. § 741(8) which defines “settlement payment” as “a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.” We were concerned in Resorts with whether the payment to Lowenschuss involved “any other similar payment commonly used in the securities trade.” In our opinion, we cited several district court opinions that excluded leveraged buyout payments from the definition of “settlement payment” as those courts reasoned that the payments did not use the system of intermediaries and guarantees that normal public-securities transactions employ. Resorts, 181 F.3d at 515 (citing Zahn v. Yucaipa Capital Fund, 218 B.R. 656, 675-76 (D.R.I.1998); Wieboldt Stores, Inc. v. Schottenstein, 131 B.R. 655, 664-65 (N.D.Ill.1991)).
In Resorts we also reviewed an opinion of the Court of Appeals for the Eleventh Circuit holding that a financial institution was not “involved” in a leveraged buyout payment because a bank did not acquire a beneficial interest in the shares being exchanged; rather the banks were merely acting as conduits. Id. at 516 (citing Munford, Inc. v. Valuation Research Corp., 98 F.3d 604, 610 (11th Cir.1996)). The court’s approach in Munford was clearly a different way of expressing the same position as the district courts whose opinions we had cited in Resorts when they excluded leveraged buyouts payments from the definition “settlement payments” — namely, that “settlement payments” must travel through the system of intermediaries and guarantees that normal securities transactions employ. In Resorts we recognized that a clearing agency had not been involved in the settlement for Lowenschuss’s shares and that the financial institutions involved acted only as conduits.
In view of our recognition of the limited role of the financial institutions in Resorts, if we had accepted the view of the Court of Appeals for the Eleventh Circuit in Mun-ford and the several district court opinions that we cite above, we would have concluded that the payment to Lowenschuss was not a “settlement payment,” safe from be *258 ing avoided as a fraudulent transfer, but we rejected the courts’ reasoning. Instead we held that the definition of “settlement payment” was broad and that in the securities trade, “a settlement payment is generally the transfer of cash or securities made to complete a transfer payment.” Id. at 515 (citing Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 849 (10th Cir.1990) (relying on several industry texts)). We concluded, “[a] payment for shares during [a leveraged buyout] is obviously a common securities transaction, and we therefore hold that it is also a settlement payment” for the purposes of section 546(e). Id. at 516. Based on this conclusion, we dismissed the adversary proceeding against Lowenschuss.
B. Distinguishing Privately-Traded Shares from Publicly-Traded Shares
Though Resorts seemingly should be determinative here because Fleet Bank transferred the buyout funds to the shareholders’ banks and thus financial institutions were implicated in the transfers, the trustee argues that Resorts should not control our outcome because Resorts International was a publicly-traded company while Plassein only acquired privately-held companies. Moreover, the trustee argues that our opinion in Resorts took too wide a scope in considering the meaning of the phrase “the securities trade.” The trustee argues that the “securities trade” refers to “the industry dealing in publicly-traded securities ... and naturally refers only to the ‘business of buying and selling’ publicly-traded securities.” Appellant’s Br. at 18 (emphasis in original). Thus, the trustee is arguing that the meaning of “settlement payment” is limited to payments made for securities in the actual public securities market. In contrast, however, in Resorts we concluded that the meaning of “settlement payment” is best understood by examining how the term is used by those who work in the public securities market.
The trustee argues that Resorts did not consider the arguments he advances here and therefore we are not bound by that case, but we think that Resorts implicitly rejected the trustee’s contentions advanced in this case. Certainly Resorts expressly rejected the argument that “settlement payments” must travel through the settlement system. Though it is true that Resorts International was a publicly-traded company whose shares when traded and the payment for them normally traveled through the settlement system, that circumstance had no bearing on our decision in Resorts. Lowenschuss sold his shares to Resorts International in a transaction outside of the publicly traded securities settlement system. See supra note 1 (describing the settlement system). If in determining what type of transaction constituted a settlement payment we had applied the definition the trustee advances here, we would have found that the shares in Resorts, as they were actually traded in that case, were not part of the “industry dealing in publicly-traded securities” but we did not do so. Instead, in Resorts we explored the meaning of “settlement payment” by examining how that term is used by those who work in the securities trade, and recognized that persons who work in the securities trade use the term “settlement payment” when referring to the payment that completes a leveraged buyout. Cf. QSI Holdings, Inc. v. Alford (In re QSI Holdings, Inc.), 571 F.3d 545, 549-50 (6th Cir.2009) (citing to Resorts and Contemporary Industries and holding that “[t]he value of the privately held securities at issue is substantial and there is no reason to think that unwinding that settlement would have any less of an impact on financial markets than publicly traded securities”); Contemporary Indus. Corp. v. *259 Frost, 564 F.3d 981, 986 (8th Cir.2009) (citing ResoHs and holding that “[n]othing in the relevant statutory language suggests Congress intended to exclude these payments from the statutory definition of ‘settlement payment’ simply because the stock at issue was privately held”).
For these reasons, we reject the trustee’s attempt to distinguish ResoHs. We will not ignore the plain language in that case which governs the present dispute. If we accepted the trustee’s distinction, we would, at a minimum, be calling ResoHs into serious question. But in this Court, a panel will not reject the clear holding of a previous panel. See 3rd Cir. Internal Operating P. 9.1; Blair v. Scott Specialty Gases, 283 F.3d 595, 610-11 (3d Cir.2002).[6]
V. CONCLUSION
Because we conclude that our opinion in ResoHs directly controls the outcome in this case, we will affirm the District Court’s order of May 15, 2008, affirming the Bankruptcy Court’s order of April 20, 2007.

. In the settlement system, a third-party clearing agency acts as an intermediary between an anonymous buyer and seller. The clearing agency, however, is more than just a conduit because it guarantees to the buyer and seller that the transaction will settle as agreed, an event normally occurring a few days after the trade is booked. This guarantee inspires confidence in the trading system and permits lightning-fast trading but it also subjects the clearing agency to possible liability if the transaction does not settle as agreed. For their part, the buyer and seller guarantee that they will deliver the money and securities as promised, even though they may be waiting to receive that property from some other party. See generally Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.), 952 F.2d 1230, 1238 n. 4 (10th Cir.1991).

. Even though the trustee contends that the transfers were fraudulent under Delaware law he does not contend that section 546(e) is limited to creating a safe harbor for transfers challenged as fraudulent under the Bankruptcy Code, though he does argue that, on the facts, section 546(e) is inapplicable here. In this regard we point out that section 546(e) is regularly applied when transfers are challenged as fraudulent under state law. Nevertheless, at least in theory, it might be possible to obtain different results in state and bankruptcy court proceedings seeking to avoid the same transaction as fraudulent.

. The Bankruptcy Court also concluded that it should dismiss the adversary proceeding because the trustee had failed to plead the elements of a claim for a fraudulent transfer but we do not address that holding on this appeal.

. Congress has amended section 546(e) since we decided Resorts but we are not concerned with when the amendments became effective because at the time of Resorts, and now, the section shielded settlement payments to financial institutions. This case focuses on the use of that shield.

. The trustee advanced other bases for recovering the payment to Lowenschuss but we need not discuss them.

. The defendant shareholders also contend that the trustee's complaint fails to state a claim for fraudulent transfer under §§ 1304 and 1305 of Delaware’s Uniform Fraudulent Transfer Act, Del.Code Ann. tit. 6, § 1301 et seq. (2005), but, because we have concluded that section 546(e) bars the trustee's action, we need not address that additional argument.